**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re *Ex Parte* Application of | ) |
| | ) |
| | ) Civil Misc. No. ___ |
| KARAM AL SADEQ, Applicant, | ) |
| | ) |
| for an Order Pursuant to 28 USC § 1782 to Take | ) |
| Discovery for Use in Foreign Proceedings. | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF KARAM AL SADEQ'S *EX PARTE*
APPLICATION PURSUANT TO 28 U.S.C. § 1782 TO TAKE DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................3

    A.  Dechert's Role in RAK's Illegal Rendition of Mr. Al Sadeq ...................................3

    B.  Dechert's Involvement in the Gross Mistreatment of Mr. Al Sadeq ......................4

    C.  Mr. Gerrard's Lies About Dechert's Gross Mistreatment of Mr. Al Sadeq ...........6

    D.  Dechert's Public Relations Campaign to Cover Up its Gross Mistreatment of Mr. Al Sadeq.........................................................................................7

    E.  Dechert's Hacking Campaign to Undermine Mr. Al Sadeq's Legal Defense ................................................................................................8

    F.  Mr. Newbold and Dechert's Policy Committee.........................................................9

    G.  The Foreign Proceeding Against Dechert and Dechert Partners ...........................10

    H.  The Discovery Sought from Mr. Newbold ...........................................................11

III.  LEGAL STANDARD........................................................................................12

IV.  ARGUMENT ....................................................................................................14

    A.  Mr. Al Sadeq Satisfies Section 1782's Statutory Requirements............................14

    B.  The Supreme Court's Intel Factors Favor Granting Mr. Al Sadeq's Application........................................................................................15

        1.  Mr. Newbold is Not a Party to the Foreign Proceeding............................15

        2.  The U.K. Court is Receptive to Discovery Obtained through This Application................................................................................15

        3.  The Application Does Not Circumvent the Rules of the Foreign Tribunal................................................................................16

        4.  Mr. Al Sadeq's Requested Discovery is Narrowly Tailored and Does Not Impose An Undue Burden on Mr. Newbold............................17

V.  CONCLUSION...................................................................................................18

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Appl. Blue Oil Trading Ltd.*,
No. 09MC153, 2009 WL 3353293 (W.D.N.C. Oct. 15, 2009)................................16

*In re Appl. of Apple Retail UK Ltd.*,
No. 20-mc-80109, 2020 WL 3833392 (N.D. Cal. July 8, 2020) ............................16

*In re Biomet Orthopaedics Switzerland GmBh*,
742 F. App'x 690 (3d Cir. 2018) ....................................................................14, 16

*In re Chevron Corp.*,
633 F.3d 153 (3d Cir. 2011)...............................................................................15

*Eurasian Nat. Res. Corp. v. Simpson*,
No. 19-mc-00699, 2020 WL 8456039 (D. Md. Jan. 6, 2020) ...............................16

*In re FourWorld Capital Mgmt., LLC*,
No. 23-1460, 2024 WL 1637400 (D. Del. Apr. 16, 2024)......................................17

*In re Germano Dos Santos*,
No. 22-1567, 2023 WL 4993673 (D.N.J. Aug. 4, 2023) .........................................17

*In re Ex Parte Glob. Energy Horizons Corp.*,
647 F. App'x 83 (3d Cir. 2016) .............................................................................17

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)................................................................................. *passim*

*In re Iraq Telecom Ltd.*,
No. 19-175, 2021 WL 5177603 (E.D. Pa. Nov. 5, 2021) ......................................14

*In re Iraq Telecom Ltd.*,
No. 19-175, 2023 WL 2402873 (E.D. Pa. Mar. 8, 2023) .....................14, 15, 16, 17

*In re Karam Al Sadeq*,
No. 21-mc-0006, 2021 WL 4844754 (M.D.N.C. Oct. 18, 2021) ............................16

*In re Letter of Request from SPS Corp. I.*,
No. 21-mc-00565, 2022 WL 3908067 (D. Del. Aug. 30, 2022)..............................13

*In re O'Keeffe*,
646 F. App'x 263 (3d Cir. 2016) ....................................................................13, 16

*In re Request from Vienna*,
    No. 23-mc-258, 2023 WL 6278815 (D. Del. Sept. 26, 2023) ................................................16

**Statutes**

28 U.S.C. § 1782 ...................................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 45 ....................................................................................................................17

# I.    INTRODUCTION

Karam Al Sadeq respectfully submits this Memorandum of Law in support of his *ex parte* application pursuant to 28 U.S.C. § 1782 ("Section 1782") for an order permitting the issuance of subpoenas directing Mr. Arthur Newbold to produce documents and submit to a deposition in connection with a pending case in the U.K. Mr. Al Sadeq's Application is supported by the declaration of Haralambos Tsiattalou ("Tsiattalou Decl."), who serves as Mr. Al Sadeq's lawyer in the U.K. case, and accompanying exhibits. That case, captioned *Karam Salah Al Din Awni Al Sadeq v. Dechert LLP, Neil Gerrard, David Hughes, and Caroline Black* (Claim No. QB-2020-000322) (the "Foreign Proceeding"), is pending before the High Court of Justice of England and Wales, King's Bench Division. Tsiattalou Decl. Ex. 1, Al Sadeq Claim. In the Foreign Proceeding, Mr. Al Sadeq sued Dechert LLP ("Dechert") and three former partners for human rights abuses, unlawful detention, and gross misconduct committed by the defendants in connection with an investigation that Dechert was undertaking for the Ras Al Khaimah Investment Authority ("RAKIA"),the sovereign wealth fund of the Emirate of Ras Al-Khaimah ("RAK"). Mr. Newbold is a former Dechert partner who served as Dechert's General Counsel and a member of the firm's Policy Committee when Mr. Al Sadeq suffered the human rights abuses. Tsiattalou Decl. Ex. 9 (Letter from A. Newbold (May 27, 2016)). Mr. Newbold was involved in discussions at Dechert regarding Mr. Al Sadeq, his allegations of abuse, and related efforts by Dechert to minimize bad publicity regarding these allegations against Dechert and its partners.

Specifically, Mr. Al Sadeq alleges that: RAK kidnapped and illegally transported Mr. Al Sadeq from Dubai to RAK, with Dechert's knowledge; Dechert partners were involved in blindfolding, shackling, and detaining of Mr. Al Sadeq in solitary confinement for 560 days without charges or access to attorneys; and Dechert partners committed acts of torture and

inhumane treatment against Mr. Al Sadeq in order to elicit false confessions.  The judge in the Foreign Proceedings has described the allegations of human rights violations as "*likely among the most serious ever levelled against English solicitors in civil proceedings*." Tsiattalou Decl. Ex. 2 (Approved Judgment ¶ 19 (May 5, 2021) (J. Murray)). Mr. Al Sadeq remains in prison in RAK to this day, and, once again, his access to counsel has been gravely restricted.

Evidence in the Foreign Proceeding establishes that Dechert, through partners Neil Gerrard and others, lied in multiple court proceedings to cover up their involvement in the human rights violations against Mr. Al Sadeq. Dechert's own documents also reveal that Dechert retained a public relations firm to launch a media campaign to disavow Dechert's involvement in Mr. Al Sadeq's abuse. In addition, Dechert engaged in an extensive hacking scheme to hack Mr. Al Sadeq, his family, and his U.K. counsel in an effort to obstruct Mr. Al Sadeq's legal defense and blunt any adverse publicity.

Mr. Newbold has personal knowledge of the alleged human rights violations against Mr. Al Sadeq. He was involved in internal meetings and discussions regarding Al Sadeq's case. In addition, as a member of Dechert's Policy Committee, the firm's highest governing committee and management team, Mr. Newbold met multiple times with Dechert management during Mr. Al Sadeq's detention to discuss the abuse allegations and Dechert's oversight, strategic decisions, and response to the allegations. He is an agreed upon document custodian in the Foreign Proceedings, confirming his significance to the case.

Mr. Al Sadeq has met the statutory requirements for obtaining discovery under Section 1782. Mr. Al Sadeq seeks discovery from an individual (Mr. Newbold) who resides in and is found in this District. Mr. Al Sadeq will use the discovery in proceedings that are pending before a U.K. court, and the discovery Mr. Al Sadeq seeks is from Mr. Newbold personally and not from Dechert.

Mr. Al Sadeq is also an "interested party" in the Foreign Proceeding because he is the Claimant and Plaintiff.

Furthermore, the discretionary factors identified by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.* ("*Intel*"), 542 U.S. 241 (2004) all favor granting Mr. Al Sadeq's requested discovery. Mr. Newbold is not a party to the case before the U.K. court. U.K. courts are receptive to discovery obtained through Section 1782 applications. Mr. Al Sadeq's application is not an attempt to circumvent the U.K. court's proof gathering requirements because Mr. Newbold is located in the U.S. and beyond the reach of U.K. courts. Finally, Mr. Al Sadeq seeks discovery that is highly relevant to Dechert's and its law partners' knowledge of and involvement in the alleged human rights abuse. The discovery is narrowly tailored to avoid imposing any undue burden upon Mr. Newbold.

For all these reasons, as discussed further below, Mr. Al Sadeq's application for discovery pursuant to Section 1782 should be granted.

## II.    BACKGROUND

### A.    Dechert's Role in RAK's Illegal Rendition of Mr. Al Sadeq

Mr. Al Sadeq is a Jordanian citizen and former General Counsel to RAKIA. Tsiattalou Decl. ¶ 11. In 2014, RAKIA retained Dechert to investigate its former Chief Executive Officer, Dr. Khater Massaad, and that investigation included investigation of those associated with Dr. Massaad, including Mr. Al Sadeq. *Id.*

On September 5, 2014, RAK security officials (acting on the instructions of the Ruler of RAK) kidnapped Mr. Al Sadeq in Dubai and illegally transported him to RAK without charging him. *Id.* ¶ 12. In RAK, Dechert partners Neil Gerrard, David Hughes, and Caroline Black interrogated Mr. Al Sadeq about his relationship with Dr. Massaad. *Id.* RAK made no formal request to extradite Mr. Al Sadeq, as it was required to do, and no document evidencing a formal

3

extradition request has been produced in the Foreign Proceeding. *Id.* ¶ 13. Dechert's own documents show that Dechert partner, Caroline Black, was aware that Mr. Al Sadeq had been "shipped" to RAK. *Id.* Indeed, the U.K. Court in the Foreign Proceeding has already found *prima facie* evidence (which in the context of the Foreign Proceeding means established on the balance of probabilities in light of the materials before the Court) that Mr. Al Sadeq was unlawfully extradited to RAK. *See id.* ¶ 14; Tsiattalou Decl. Ex. 3, Court of Appeals Approved Judgment § 111 (Jan. 24, 2024) ("In my view the material clearly establishes a prima facie case (in the sense required) of this iniquity" and was "uncontradicted in circumstances in which there was an opportunity" to do so.).

Mr. Al Sadeq intends to question Mr. Newbold about Dechert's knowledge of and involvement in the kidnapping and illegal rendition of Mr. Al Sadeq. Mr. Newbold was informed of and actively monitored allegations of human rights violations against Mr. Al Sadeq.

### B.     Dechert's Involvement in the Gross Mistreatment of Mr. Al Sadeq

After he was kidnapped and illegally transported to RAK, Mr. Al Sadeq was held in solitary confinement for roughly 560 days in a small cell, 10 feet by 3 feet, without access to sunlight. Tsiattalou Decl. ¶ 15.  Mr. Al Sadeq was held in squalid conditions without basic human necessities such as water for personal hygiene. *Id.*

Throughout Mr. Al Sadeq's illegal detention, prison guards repeatedly brought Mr. Al Sadeq in shackles to Mr. Gerrard, Mr. Hughes, and Ms. Black. *Id.* ¶ 16. These Dechert partners repeatedly blindfolded him, interrogated him, and threatened him and his family in an attempt to force him to sign false confessions implicating others. *Id.* Consequently, Mr. Al Sadeq suffered severe psychological trauma, physical pain, suffering, financial loss, and reputational harm resulting from his treatment by Dechert. Mr. Al Sadeq remains incarcerated in RAK, and the abuse is continuing. *Id.*

For nearly a year—from September 2014 to August 2015—Mr. Al Sadeq was denied access to counsel, despite his repeated requests to Dechert partners. *Id.* ¶ 17. He was not permitted to make phone calls or see anyone other than Dechert lawyers or the RAK prosecutor, who deployed abusive tactics. Dechert partners repeatedly denied his requests for counsel. *Id.*

The U.K. Court in the Foreign Proceeding has ruled that Mr. Al Sadeq has made a *prima facie* showing that he was mistreated during his detention and improperly denied access to counsel. *Id.* ¶ 18; Tsiattalou Decl. Ex. 3, Court of Appeals Approved Judgment §§ 119, 120 (Jan. 24, 2024) ("In my view the material also clearly establishes a prima facie case (in the sense required) of this iniquity" and was "uncontradicted in circumstances in which there was an opportunity" to do so.); Tsiattalou Decl. Ex. 3, Court of Appeals Approved Judgment § 127 (same).

Dechert retained an internationally recognized human rights expert to assess the conditions of Mr. Al Sadeq's detention but then sought to cover up his findings of human rights violations. Tsiattalou Decl. ¶ 19. In October 2015, human rights expert Dr. Mitchell and a Dechert attorney, Mr. Geuther, visited the Al Barirat facility in which Mr. Al Sadeq was detained. Dr. Mitchell found that Mr. Al Sadeq and another RAK victim, Jihad Quzmar, had been held in solitary confinement with no access to light, in "clear breach" of Article 3 the European Convention on Human Rights (the prohibition on torture and inhumane and degrading treatment). *Id.*; Tsiattalou Decl. Ex. 4 (Handwritten notes of Dechert's T. Geuther from October 29, 2015 documenting Dr. Mitchell's findings and typed version of handwritten notes). However, Mr. Geuther, the Dechert attorney, documented in writing that Dr. Mitchell would not report his findings, subject to Dechert's instructions and that Jamie Buchanan (a RAKIA official) may want Dr. Mitchell's findings removed from the file. Tsiattalou Decl. Ex. 4. Mr. Geuther's memo to file also states that Mr. Hughes (another Dechert partner) has a similar note (i.e. detailing the findings of the human rights

abuses) on paper. However, Dechert's attorney in the U.K. Proceeding has given evidence that Mr. Hughes' notebook that presumably contained that note has four pages from the relevant time period torn from it, one of which has not been located.

Mr. Al Sadeq intends to question Mr. Newbold about Dechert's involvement in the gross mistreatment of Mr. Al Sadeq while detained in RAK and subsequent cover up. This includes the shacking, blindfolding, and threatening of Mr. Al Sadeq to elicit false testimony; Mr. Al Sadeq's solitary confinement in squalid conditions without access to basic necessities; and his denial of access to counsel. Mr. Al Sadeq also seeks to question Mr. Newbold about Dechert's attempt to whitewash a human rights expert's findings of human rights violations against Mr. Al Sadeq, and Dechert's failure to act upon those findings. As a former Dechert partner and member of the firm's Policy Committee, Mr. Newbold was informed of and actively monitored allegations of human rights violations against Mr. Al Sadeq, and upon information and belief, was involved in making decision about how to address those allegations.

### C.   Mr. Gerrard's Lies About Dechert's Gross Mistreatment of Mr. Al Sadeq

Mr. Gerrard has lied under oath to cover up Dechert's involvement in gross human rights violations against Mr. Al Sadeq. Tsiattalou Decl. ¶ 20. Mr. Gerrard has admitted that he falsely testified about his involvement with Mr. Al Sadeq in a separate U.K. proceeding, *RAKIA v Farhad Azima [2020] EWHC 1327 (Ch)* (the "Azima Proceeding") before Mr. Al Sadeq filed his complaint in the Foreign Proceeding. *Id.* Mr. Gerrard testified that he interviewed Mr. Al Sadeq only once, with the agreement of Mr. Al Sadeq's lawyer, and that the interview complied with U.K. law governing the treatment of prisoners. *Id.* After the trial was over and the judge ruled, Mr. Gerrard formally recanted his testimony. *Id.* In a corrective witness statement, Gerrard admitted that he interviewed Mr. Al Sadeq multiple times, not once, that Mr. Gerrard's interviews did not comply with U.K. human rights law, and that Mr. Al Sadeq's counsel was not present for all but one

interview. *Id.* In other words, Dechert partner Gerrard admitted that he conducted an interview in violation of law while a Dechert partner. *Id.*

The U.K. court ruled that Mr. Gerrard's original account, delivered "with bluster . . . in unambiguous terms and emphatic tone," "turned out to be wrong" and that Mr. Gerrard failed to give a satisfactory explanation for his changing story. *Id.* ¶ 21; Tsiattalou Decl. Ex. 5, Approved Addendum to Judgment in *RAKIA v. Azima* ¶ 17 (June 30 2020). In another U.K. proceeding in which Mr. Gerrard testified (*Eurasian Natural Resources Corporation Limited (ENRC) v Dechert LLP and Neil Gerrard and the Director of the Serious Fraud Office [2023] EWHC 3280 (Comm)*), the court found Mr. Gerrard to be a "dishonest witness", who was "plainly lying." Tsiattalou Decl. ¶ 22; Tsiattalou Decl. Ex. 6, ENRC Judgment ¶ 251 (May 16, 2021).

Mr. Al Sadeq intends to question Mr. Newbold about the lies Mr. Gerrard told the U.K. court about his interrogation of Mr. Al Sadeq, whether Dechert was aware that he lied at the time he testified, and Dechert's role in covering up the false testimony. As a former Dechert partner and member of the firm's Policy Committee, Mr. Newbold was informed of and actively monitored the trial at which Mr. Gerrard falsely testified and reviewed Mr. Gerrard's representations about the allegations of human rights violations against Mr. Al Sadeq.

**D.     Dechert's Public Relations Campaign to Cover Up its Gross Mistreatment of Mr. Al Sadeq**

Dechert launched a negative media campaign to conceal the mistreatment of Mr. Al Sadeq and damage the reputation of Dr. Massaad, who was another RAK victim. Tsiattalou Decl. ¶ 23. Dechert and RAK's ruler retained a public relations firm, Bell Pottinger, to set up a website in Dr. Massaad's name that posted negative media stories about him. *Id.*

Dechert also prepared scripts for RAK's ruler to respond to media inquiries about Mr. Al Sadeq, falsely stating that Mr. Al Sadeq had been treated humanely. *Id.* ¶ 24. For example, a March

2015 press briefing note for the Ruler falsely stated that Mr. Al Sadeq had not requested a lawyer. *Id.* By July 2016, Mr. Gerrard and Mr. Hughes feared that Mr. Al Sadeq's mistreatment would be publicized, which in turn would lead to negative publicity for Dechert and loss of lucrative work. *Id.* In August, Dechert's media relations firm prepared talking points to respond to media inquiries that falsely stated that Mr. Al Sadeq had been detained at Al Bairat for his own safety. *Id.*; Tsiattalou Decl. Ex. 7 (Email from A. Holdsworth of Bell Pottinger to D. Hughes of Dechert attaching media talking points (Aug. 18, 2016)). Dechert's public relations firm also prepared a press release stating that Mr. Al Sadeq reported the "extremely fair treatment and comfortable conditions he experienced during his time in prison." Tsiattalou Decl. ¶ 25. Upon information and belief, Mr. Newbold monitored the press coverage of cases brought by Mr. Al Sadeq and other RAKA victims, and Dechert's public relations campaign in response, through at least 2020. *Id.*

Mr. Al Sadeq intends to question Mr. Newbold about Dechert's media campaign to conceal the human rights violations against Mr. Al Sadeq and Dechert partners' involvement in it. As a former Dechert partner and member of the firm's Policy Committee, Mr. Newbold has knowledge of Dechert's strategic response to the allegations.

## E. Dechert's Hacking Campaign to Undermine Mr. Al Sadeq's Legal Defense

Part of Dechert's response to Mr. Al Sadeq's allegations was to launch a massive hack and leak scheme in order to stymie Mr. Al Sadeq's legal defense. *Id.* ¶ 26. Dechert deployed a team of hackers to steal the confidential data of Mr. Al Sadeq, his family, and his U.K. counsel. *Id.* Evidence in the Foreign Proceeding reveals that hackers – including Amit Forlit, who is currently awaiting extradition to the United States on hacking charges – prepared numerous reports, so-called Project Beech Reports, some of which analyzed the confidential data of these hacking victims. *Id.* ¶ 27. The Project Beech Reports indicate that Dechert was involved in the compilation of the reports which contained the hacked confidential data, and that Dechert was provided copies

of the hacked data. *Id.* Shortly after Mr. Al Sadeq's lawyers initiated litigation against an investigator working for Dechert, two of their phones were infected with the advanced spyware software Pegasus. *Id.* ¶ 33-34.

Mr. Newbold served as Dechert's point person in responding to allegations that Dechert, Mr. Gerrard, and Mr. Hughes were involved in the hacking of perceived enemies of their client, RAKIA. *Id.* ¶ 28. Mr. Newbold, on Dechert's behalf, represented that Dechert had no knowledge of the hacking. *Id.* Upon information and belief, Dechert lawyers also shopped hacked data to U.S. law enforcement in order to instigate criminal investigations into these victims. *Id.* ¶ 29. Dechert partners kept Mr. Newbold apprised of their retention of a cybersecurity firm, NTi, which Dechert retained to analyze and exploit the hacked data. *Id.*

Mr. Al Sadeq intends to question Mr. Newbold about Dechert's involvement in hacking Mr. Al Sadeq, his attorneys, and other victims; Dechert's failure to cease that illegal activity; and its failure to inform the victims of its crimes.

### F.    Mr. Newbold and Dechert's Policy Committee

Mr. Newbold served on Dechert's Policy Committee at least between 2015 and 2016 during Mr. Gerrard's and Dechert's gross mistreatment of Mr. Al Sadeq. *Id.* ¶ 30. The Policy Committee serves as Dechert's primary leadership and decision-making body. *Id.* It also exercises oversight of risk management and inquiries into the conduct of Dechert attorneys. *Id.* Dechert's Policy Committee was fully aware of Mr. Al Sadeq's abuse, including at the hands of Dechert partners. *Id.*

Mr. Gerrard testified in the U.K. that, in the months prior to August 2016, he briefed Dechert's Policy Committee about the allegations of human rights abuses against Mr. Al Sadeq by Dechert and others. *Id.* ¶ 31. Dechert's U.K. lawyer has given evidence that Mr. Gerrard and Mr.

Hughes discussed with the Policy Committee a potential negative media campaign against Mr. Gerrard and Dechert. *Id.* Mr. Newbold attended meetings with Policy Committee members at which the negative media campaign was discussed, including meetings on September 29, 2015, July 7, 2016, July 18, 2016, and a meeting held at Dechert's New York office, which Mr. Newbold attended by phone. *Id.*

Dechert documents show that the firm's Policy Committee had concerns about Mr. Gerrard's ethics long before he became involved with Mr. Al Sadeq. *Id.* ¶ 32. The Policy Committee recognized Mr. Gerrard's pattern of "scaremongering" clients to inflate billing, suggesting a clear awareness within the firm of Mr. Gerrard's propensity to manipulate situations for financial gain. *Id.* Dechert's awareness of Mr. Gerrard's inclination to mislead clients of his other illicit conduct supports a strong inference that the firm's leadership had reason to monitor and investigate his activities. *Id.*

Mr. Al Sadeq intends to question Mr. Newbold about what Dechert's Policy Committee knew about the allegations of human rights violations and when it knew those facts.

### G.    The Foreign Proceeding Against Dechert and Dechert Partners

In January 2020, Mr. Al Sadeq sued Dechert, Mr. Gerrard, Mr. Hughes, and Ms. Black in the U.K. for violating UAE constitutional law, UAE criminal law, and international human rights law, including:

- **Unlawful rendition and detention** related to Mr. Al Sadeq's abduction from Dubai and prolonged detention without charge, including solitary confinement under a false name.

- **Coercive interrogation** related to Dechert partners subjecting Mr. Al Sadeq to intense questioning while he remained blindfolded, shackled, and was denied legal

counsel and while the freedom of his wife and the safety of his children were

threatened by Dechert partners; and

- **False confessions** related to Mr. Gerrard and Mr. Hughes demanding and extracting

  false statements from Mr. Al Sadeq implicating himself and others in fraud against

  RAK while holding Mr. Al Sadeq under duress.

Tsiattalou Decl. ¶ 35.

Mr. Al Sadeq is in the process of amending his claim to include allegations regarding

Dechert's Policy Committee, of which Mr. Newbold was a member. *Id.* ¶ 36. Defendants in the

Foreign Proceeding have consented in principle to the amendments concerning Mr. Newbold. Mr.

Al Sadeq alleges that Mr. Gerrard abused him with the knowledge and direction of Dechert, and

that those abuses were part of a broader campaign to silence Mr. Al Sadeq and punish him. *Id.*

Dechert concedes that Mr. Newbold possesses relevant information to Mr. Al Sadeq's claims:

Dechert previously identified Mr. Newbold as a custodian in Dechert's October 29, 2021 witness

statement filed in the Foreign Proceeding. *Id.* ¶ 37.

### H.    The Discovery Sought from Mr. Newbold

Mr. Al Sadeq seeks discovery regarding Mr. Newbold's knowledge of Dechert's abuse of

Mr. Al Sadeq, Dechert's awareness of those allegations, and Dechert's attempts to manage public

reaction to the allegations against it and to cover up its misconduct. *Id.* ¶ 38. In addition, Mr.

Newbold can provide valuable evidence regarding what Dechert knew, when it knew it, and what

action, if any, it took upon learning that its partners had engaged in crimes. *Id.*

Mr. Newbold managed Dechert's response to the allegations of human rights abuses by

Dechert. *Id.* ¶ 39. Mr. Gerrard's team briefed Mr. Newbold on Mr. Al Sadeq's interrogation and

conditions of confinement, including through a July 5, 2016 memorandum in which Mr. Hughes

lied and represented that Mr. Al Sadeq was detained in a "white collar facility," had "unfettered

access to lawyers," and received overnight visits from his wife and children. *Id.*; Tsiattalou Decl.

Ex. 8 ¶ 23 (D. Hughes Memo to A. Newbold (July 5, 2016)). Mr. Newbold also tracked press

coverage of the allegations of abuses by Dechert and directed Dechert's public relations teams

regarding press coverage of Mr. Al Sadeq's human rights abuse allegations against Dechert. *Id.*

¶ 39.

      As explained above, Mr. Newbold participated on the Policy Committee in 2015 and 2016

and attended Mr. Gerrard's briefings on possible negative publicity regarding the human rights

violations by Dechert. *Id.* ¶ 40. Mr. Gerrard admitted he briefed Mr. Newbold and others on the

Policy Committee about media coverage of Mr. Al Sadeq's treatment so that the firm could

develop a strategic response and manage risk associated with these serious allegations against the

law firm and its partners. *Id.*

      Beyond his role on the Policy Committee, as General Counsel between 2016 and 2020, Mr.

Newbold oversaw the analysis of and response to the allegations of abuse by Dechert and actively

tracked Mr. Al Sadeq's confessions, confinement conditions, and case against Dechert alleging

human rights abuses. *Id.* ¶ 41.

      Mr. Al Sadeq's subpoena for personal documents and subpoena for a deposition are

attached as Exhibits A and B to the Application.

## III.    LEGAL STANDARD

      Section 1782 is intended to "provide federal-court assistance in gathering evidence for use

in foreign tribunals." *Intel*, 542 U.S. at 247. In deciding whether to grant a Section 1782

application, the Court "must first determine whether certain statutory requirements are met, and if

those requirements are satisfied, the Court may then consider other factors to determine whether

to exercise its discretion to grant the application. *In re O'Keeffe*, 646 F. App'x 263, 265-66 (3d Cir. 2016); *see also Intel*, 542 U.S. at 264.

> Section 1782 provides in part:
>
> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a). The statute therefore authorizes a district court to grant a Section 1782 application when: "(1) the person from whom discovery is sought 'resides or is found' within the district; (2) the discovery is 'for use in a proceeding before a foreign or international tribunal'; and (3) the application is made by an 'interested person.'" *In re Letter of Request from SPS Corp. I.*, No. 21-mc-00565, 2022 WL 3908067, at *2 (D. Del. Aug. 30, 2022) (quoting 28 U.S.C. § 1782(a)); *see also Intel*, 542 U.S. at 246.

Once an applicant has satisfied Section 1782's three statutory requirements, the court has discretion to order the requested discovery. *Intel*, 542 U.S. at 264. In *Intel*, the Supreme Court articulated four factors to guide district courts in exercising their discretion to grant Section 1782 applications: (1) "whether 'the person from whom discovery is sought is a participant in the foreign proceeding'"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof gathering restrictions or other policies of a foreign country or the United States"; and (4) "whether the request is 'unduly intrusive or burdensome.'" *In re Biomet Orthopaedics Switzerland GmBh*, 742 F. App'x 690, 696 (3d Cir. 2018) (quoting *Intel*, 542 U.S. at 264-65). In exercising its discretion, a district court should be mindful of what the *Intel* Court described as

13

"twin aims" of the statute: "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Intel*, 542 U.S. at 252 (internal quotation marks omitted).

## IV.    ARGUMENT

### A.    Mr. Al Sadeq Satisfies Section 1782's Statutory Requirements

Mr. Al Sadeq's application readily satisfies each of Section 1782's statutory requirements. First, Mr. Newbold "resides or is found" in the Eastern District of Pennsylvania. 28 U.S.C. § 1782(a). Mr. Newbold currently resides at 160 Grubb Road in Malvern, Pennsylvania. *See In re Iraq Telecom Ltd.*, No. 19-175, 2021 WL 5177603, at *3 (E.D. Pa. Nov. 5, 2021) (holding that the "target" of discovery governs the assessment of personal jurisdiction under § 1782(a)).

Second, Mr. Al Sadeq seeks the requested discovery "for use" in the Foreign Proceeding for a U.K. court. *See In re Iraq Telecom Ltd.*, No. 19-175, 2023 WL 2402873, at *5-6 (E.D. Pa. Mar. 8, 2023) (granting § 1782(a) discovery against Dechert for use in contemplated U.K. proceedings). Mr. Al Sadeq seeks discovery from Mr. Newbold regarding the alleged human rights abuses by Dechert and Mr. Gerrard, Mr. Hughes, and Ms. Black and Dechert's strategic responses (or lack thereof) to those allegations. This discovery will be used to assess Dechert's culpability and failure in oversight. The discovery is also relevant to showing the actual human rights abuses committed against Mr. Al Sadeq by Dechert partners.

Third, Mr. Al Sadeq is not only an "interested person" but also the plaintiff in the Foreign Proceeding. *See id.* at *3 (holding that an "interested person" is one who "merely possess[es] a reasonable interest in obtaining the assistance") (citing *Intel*, 542 U.S. at 256).

**B.      The Supreme Court's *Intel* Factors Favor Granting Mr. Al Sadeq's Application**

In addition, each of the discretionary factors articulated by the Supreme Court in *Intel* weighs in favor of granting Mr. Al Sadeq's application.

### 1.      Mr. Newbold is Not a Party to the Foreign Proceeding

The first *Intel* factor asks whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264. If the respondent is a party to the foreign litigation, "the need for § 1782(a) aid generally is not as apparent," because, in many circumstances, the "foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.* By contrast, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*; *see also In re Chevron Corp.*, 633 F.3d 153, 162 (3d Cir. 2011) (holding that the first *Intel* factor favors granting discovery where the respondent is not a participant in the foreign litigation and not otherwise subject to the foreign court's jurisdiction).

Mr. Newbold is not a party to the Foreign Proceedings. He is a former Dechert partner who resides in the U.S. The U.K. court has no ability to compel Mr. Newbold to produce discovery there. Accordingly, this factor favors granting Mr. Al Sadeq's Section 1782 application.

### 2.      The U.K. Court is Receptive to Discovery Obtained through This Application

The second *Intel* factor considers "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264. The relevant question under this factor is *not* "whether *particular* evidence would be admissible in a foreign court," *In re O'Keeffe*, 646 F. App'x at 267, nor whether the foreign tribunal will "gladly receive" the

requested discovery. *In re Biomet*, 742 F. App'x at 698. Instead, the question is simply whether the foreign tribunal is "*generally* 'receptive to American judicial assistance.'" *Id.* (cleaned up and emphasis added) (quoting *Intel*, 542 U.S. at 264); *see also In re O'Keeffe*, 646 F. App'x at 267 ("We have never required district courts to determine whether *particular* evidence would be admissible in a foreign court. Instead, *Intel* suggests the inquiry is more generally the receptivity to 'U.S. federal-court judicial assistance.'") (quoting *Intel*, 542 U.S. at 264)).

Numerous district courts have found that U.K. courts are receptive to discovery obtained through the Section 1782 process in the U.S. *See In re Appl. of Apple Retail UK Ltd.*, No. 20-mc-80109, 2020 WL 3833392, at *3 (N.D. Cal. July 8, 2020) (finding that "[i]n the absence of evidence to the contrary regarding the [UK] tribunal's receptivity to U.S. judicial assistance" the second *Intel* factor weighed in favor of granting the Section 1782 application); *In re Iraq Telecom Ltd.*, , 2023 WL 2402873, at *5-6 (granting § 1782(a) discovery against Dechert for use in contemplated U.K. proceedings); *see also Eurasian Nat. Res. Corp. v. Simpson*, No. 19-mc-00699, 2020 WL 8456039 (D. Md. Jan. 6, 2020); *In re Appl. Blue Oil Trading Ltd.*, No. 09MC153, 2009 WL 3353293 (W.D.N.C. Oct. 15, 2009). Indeed, a North Carolina district court granted Mr. Al Sadeq's Section 1782 Application for discovery from another witness in the Foreign Proceeding. *In re Karam Al Sadeq*, No. 21-mc-0006, 2021 WL 4844754 (M.D.N.C. Oct. 18, 2021).

### 3. *The Application Does Not Circumvent the Rules of the Foreign Tribunal*

The third *Intel* factor asks the Court to consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265; *see In re Request from Vienna*, No. 23-mc-258, 2023 WL 6278815, at *5 (D. Del. Sept. 26, 2023) (requests were not an attempt to circumvent proof-gathering restrictions in foreign jurisdictions where the application "disclosed that it has no mechanism to obtain" the requested discovery).

Here, Mr. Al Sadeq's application does not seek to circumvent the U.K. discovery process or any U.K. law. U.K. law does not prevent Mr. Al Sadeq from seeking, or the U.K. court from considering, evidence obtained from Mr. Newbold in the U.S. *See In re Iraq Telecom Ltd.*, 2023 WL 2402873, at *5-6 (granting § 1782(a) discovery against Dechert for use in contemplated U.K. proceedings). And, as mentioned above, the U.K. court has no jurisdiction to compel a witness located in the U.S. with relevant information to provide discovery.

> 4.    *Mr. Al Sadeq's Requested Discovery is Narrowly Tailored and Does Not Impose an Undue Burden on Mr. Newbold*

The fourth and final *Intel* factor asks whether the requested discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. "[A]ssessment of the fourth factor is virtually identical to the familiar 'overly burdensome' analysis" under the Federal Rules of Civil Procedure, which means that courts permit "discovery that appears reasonably calculated to lead to the discovery of admissible evidence." *In re Ex Parte Glob. Energy Horizons Corp.*, 647 F. App'x 83, 86 (3d Cir. 2016) (cleaned up). As with ordinary Federal Rule of Civil Procedure 45 discovery requests, the reasonableness of the discovery sought under a Section 1782 application depends on the circumstances of the foreign litigation. *See, e.g.*, *In re Germano Dos Santos*, No. 22-1567, 2023 WL 4993673, at *11 (D.N.J. Aug. 4, 2023). Courts routinely grant Section 1782 applications that seek narrowly tailored, relevant discovery for use in foreign litigation. *See, e.g.*, *In re FourWorld Capital Mgmt., LLC*, No. 23-1460, 2024 WL 1637400, at *9 (D. Del. Apr. 16, 2024) (holding that Section 1782 discovery requests are narrowly tailored if they are relevant to the issues in the foreign proceeding and declining to hold requests as overbroad without an estimate of total documents triggered by the request).

Dechert previously identified Mr. Newbold as a records custodian in the Foreign Proceeding. As discussed above, Mr. Al Sadeq's proposed subpoenas seek limited information

that is directly relevant to Mr. Newbold's knowledge of Dechert's involvement in and knowledge of human rights abuses against Mr. Al Sadeq and how Dechert addressed (or failed to address) those allegations. Mr. Al Sadeq's proposed subpoena for documents only applies to documents in Mr. Newbold's personal possession, not Dechert's, and seeks documents limited to the abuse of Mr. Al Sadeq's human rights, those of other RAK victims, and Dechert's response thereto. Similarly, Mr. Newbold's deposition testimony would be based on his personal knowledge. The discovery of Mr. Newbold's documents and his deposition testimony are essential to the central claims of human rights abuses made in Mr. Al Sadeq's case in the Foreign Proceeding. Accordingly, the fourth *Intel* factor also favors grant of Mr. Al Sadeq's application.

## V.    CONCLUSION

For the foregoing reasons, Mr. Al Sadeq respectfully requests that this Court grant his Section 1782 discovery application and enter the accompanying proposed order permitting the issuance of subpoenas directing Mr. Arthur Newbold to produce limited documents and submit to a deposition.

February 6, 2025                              Respectfully submitted,

                                                       */s/ Joshua Drew*
                                                   Joshua Drew (Pa. Bar No. 310927)
                                                   Kirby D. Behre*
                                                   Lauren E. Briggerman*
                                                   MILLER & CHEVALIER CHARTERED
                                                   900 Sixteenth St. NW
                                                   Black Lives Matter Plaza
                                                   Washington, DC 20006
                                                   Tel. (202) 626-5800
                                                   Fax. (202) 626-5801
                                                   jdrew@milchev.com
                                                   kbehre@milchev.com
                                                   lbriggerman@milchev.com

                                                   *Pro Hac Vice Application Forthcoming
                                                   *Counsel for Applicant Karam Al Sadeq*